# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DISTRICT

| | | |
|---|---|---|
| PNC EQUIPMENT FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-cv-03074 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| BONNIE ZILBERBRAND, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

PNC Equipment Finance, LLC ("PNC") filed a two-count amended complaint (dkt. 52) against defendant Bonnie Zilberbrand ("Zilberbrand") after this court denied Zilberbrand's motion to dismiss the original complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 25.)  Both the original and amended complaint allege violations of the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/1 *et seq.* ("IUFTA"), but the amended complaint seeks relief for additional allegedly fraudulent transfers not included in the original complaint.  Zilberbrand now moves pursuant to Rule 12(b)(6) to dismiss the amended complaint with respect to the additional transfers.  (Dkt. 61.)  For the following reasons, Zilberbrand's motion is granted in part and denied in part.[1]

---

[1]  As detailed in this court's previous Opinion and Order, *PNC Equipment Finance, LLC* v. *Zilberbrand*, No. 12 C 3074, 2013 WL 1278602 (N.D. Ill. Mar. 28, 2013), this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  The parties are of diverse citizenship because the sole member of PNC is PNC Bank, N.A., which has its principal place of business in Pennsylvania and is incorporated in Delaware and Zilberbrand is a citizen of Illinois.  Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b).

# BACKGROUND[2]

## I.    The original complaint and first motion to dismiss

The background of this suit is detailed in the court's previous opinion, *PNC Equipment Finance, LLC* v. *Zilberbrand*, No. 12 C 3074, 2013 WL 1278602 (N.D. Ill. Mar. 28, 2013) ("*PNC I*"), so the court will only recite the facts relevant to the present opinion.  The individuals relevant to this complaint are Zilberbrand and her husband, Ronald Zilberbrand ("Debtor").  Zilberbrand and Debtor divorced in 2003 pursuant to a September 12, 2003 marital settlement agreement and divorce decree entered by the Circuit Court of Cook County ("the divorce decree").  They then remarried on June 13, 2008.  In anticipation of their second marriage, they executed a prenuptial agreement on March 24, 2008 ("the prenuptial agreement").

As more fully laid out in *PNC I*, this suit involves Debtor's guaranties of a series of loans PNC's predecessor made to entities Debtor controlled.  Under the guaranties, PNC could pursue an action against Debtor independently of the other borrowers.  After the borrowers defaulted on the loans and PNC filed suit against them and Debtor, PNC also filed suit in this court against Zilberbrand on April 25, 2012, alleging that Debtor fraudulently conveyed property located at 2025 North Mohawk Street in Chicago, Illinois ("the Mohawk property") to Zilberbrand.

The original complaint included two claims for avoidance of the fraudulent transfer, one brought under section 160/5(a) of the Illinois Uniform Fraudulent Transfer Act ("the IUFTA"), 740 Ill. Comp. Stat. 160/5(a), and one under section 160/6(a) of the Act, 740 Ill. Comp. Stat. 160/6(a).  (*See* dkt. 5.)  Zilberbrand moved to dismiss the complaint on multiple grounds.  First,

---

[2]   The facts in the background section are taken from the complaint and exhibits attached thereto and the court draws all reasonable inferences in PNC's favor.  *See Virnich* v. *Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

she argued that PNC's complaint was barred by the four-year statute of limitations in the IUFTA because Debtor transferred the real property to Zilberbrand pursuant to their prenuptial agreement, which they executed more than four years before PNC brought the complaint. Second, she argued that the transfer was not fraudulent because Debtor received reasonably equivalent value for the transfer of the real property, *i.e.*, the marriage itself between Debtor and Zilberbrand. Third, she argued that Debtor was not insolvent when he transferred the real property to Zilberbrand, defeating PNC's claim under section 160/6 of the IUFTA. Finally, she argued that PNC did not plead any "badges of fraud" to support its claim of actual fraud under section 160/5 of the IUFTA. In support of her motion, Zilberbrand attached a copy of the prenuptial agreement. (Dkt. 12, Ex. 3.)

The court denied Zilberbrand's motion, rejecting each of Zilberbrand's arguments. *See generally PNC I*, 2013 WL 1278602. It held that the statute of limitations did not bar the claims because it was the marriage, and not the prenuptial agreement, that triggered Debtor's obligations to transfer the real property, and the marriage and transfer both took place within the four-year limitations period. *Id.* at *3. Next, it held that the promise to marry did not constitute reasonably equivalent value. *Id.* at *4. Regarding Debtor's insolvency, it held that PNC sufficiently alleged Debtor was insolvent or became insolvent as a result of the transfer to obviate PNC's ability to collect on the notes. *Id.* Finally, the court determined that PNC adequately pleaded a claim for actual fraud under the IUFTA by pleading the requisite badges of fraud and by pleading its claims with sufficient particularity under Federal Rule of Civil Procedure 9(b).

**II. PNC's amended complaint and Zilberbrand's second motion to dismiss**

On June 28, 2013, PNC moved to amend its complaint (dkt. 46), which motion the court granted on July 10, 2013 (dkt. 51). PNC filed its amended complaint the next day. (Dkt. 52.) The amended complaint again includes two counts, for avoidance of fraudulent transfer under sections 160/5 and 6 of the IUFTA but expands the number of transfers to Zilberbrand beyond the Mohawk property transfer. In particular, PNC alleges that Debtor had an ownership interest in Jet Support Services, Inc. ("JSSI"), which he sold on or about May 27, 2008, for approximately $15,420,624. Pursuant to the prenuptial agreement, Debtor transferred 40% of the proceeds from this sale to Zilberbrand, or approximately $6,164,256.80 ("the JSSI transfer").[3] The amended complaint also alleges that, pursuant to paragraphs 19(a) and (b) of the prenuptial agreement,[4] Debtor transferred to Zilberbrand an amount equal to all costs of

---

[3] Paragraph 8(b) of the prenuptial agreement provides, "If during the marriage of the parties RON should sell his ownership interest in JSSI, then RON shall pay BONNIE an amount equal to forty percent (40%) of the sales proceeds received by RON net of all expenses reasonably incurred by RON in connection with such sale. . . ." (Am. Compl., Ex. 8 at ¶ 8(b)). As will be discussed further below, Zilberbrand points to the fact that the parties' divorce decree from September 12, 2003 provided that Zilberbrand would be awarded a portion of Debtor's interest in JSSI. The divorce decree stated that from 30 to 60 months after the entry of the divorce decree, Zilberbrand would receive 40% of any sums distributed as a result of Debtor's ownership interest in JSSI, and after 60 months, Zilberbrand would receive 33 1/3% of any sums distributed as a result of Debtor's ownership of JSSI. (Am. Compl., Ex. 11 at ¶ VII.2.C.)

[4] Paragraph 19 of the prenuptial agreement provides,

(a) RON agrees to pay BONNIE the sum of eleven thousand two hundred dollars ($11,200) per month commencing with the first day of the calendar month following the marriage of the parties, and continuing on the first day of each calendar month thereafter until the month in which the parties, or either of them, move into the Mohawk Property.

* * *

(b) Commencing with the marriage of the parties, provided and for so long as BONNIE is the owner of the property commonly known as 164 W. Goethe Street, Chicago, Illinois

(continued...)

4

maintaining real estate located at 164 W. Goethe Street, Chicago, Illinois ("the Goethe

property"), plus $11,200 per month until either moves into the Mohawk property (together, the

"paragraph 19 transfers").[5]  In addition, the amended complaint seeks relief for "all presently

unknown and unknowable additional assets that may have been transferred from Debtor to

Defendant that Plaintiff may discover during the course of this action" ("the paragraph 42

transfers").  (Am. Compl. ¶ 42.)  Zilberbrand has moved to dismiss all new claims PNC asserts

in its amended complaint.  (Dkt. 61.)

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a

complaint for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6);

*Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  In

ruling on a 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts in the

plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.

*Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).  To survive a 12(b)(6) motion, the complaint

must not only provide the defendant with fair notice of a claim's basis, but must also establish

that the requested relief is plausible on its face.  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937,

173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct.

1955, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

_____

(...continued)
      (the "Goethe Property["]), RON agrees to pay all of the costs of maintaining the Goethe
      Property[.]

(Am. Compl., Ex. 9 at ¶ 19.)

    [5]  As discussed further below, Zilberbrand argues that the $11,200 sum replaces the $14,250 per
month sum Debtor was obligated to pay Zilberbrand as maintenance starting on October 1, 2003 pursuant
to their divorce decree.  (Am. Compl., Ex. 10 at ¶ II.1.)

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s pleading threshold, the pleader must detail "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Gen. Elec.*, 128 F.3d at 1078 (internal quotation marks and citation omitted); *Vicom, Inc.* v. *Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). Stated differently, the complaint must include the "who, what, when, and where of the alleged fraud." *Uni*Quality, Inc.* v. *Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal quotation marks omitted).

## ANALYSIS

PNC's amended complaint brings claims under the IUFTA alleging constructive fraud and actual fraud and seeking to set aside additional transfers of assets to Zilberbrand, specifically the JSSI transfer, the paragraph 19 transfers, and the paragraph 42 transfers (together, "the financial transfers"). Actual fraud takes place where the debtor has the specific intent to hinder his creditors while constructive fraud occurs where the debtor conveys assets for inadequate consideration resulting in his insolvency despite preexisting or contemplated debts.[6] *See Cordes*

---

[6] The difference between constructive fraud claims under § 5(a)(1) and § 6(a) is that under the former the creditor's claim can arise before or after the transfer while under the latter the creditor must have a claim against the debtor before the transfer. PNC alleges constructive fraud under § 5(a)(1) and

(continued...)

& *Co., LLC* v. *Mitchell Cos., LLC*, 605 F. Supp. 2d 1015, 1020 (N.D. Ill. 2009). Zilberbrand argues that PNC's new IUFTA claims for the financial transfers fail because (1) they are barred by the statute of limitations and do not relate back to the filing of the original complaint; (2) PNC cannot point to any transfer that actually occurred; (3) any transfer that did occur was in satisfaction of an antecedent debt; and (4) PNC's claim for "all unknown and unknowable assets that may have been transferred" fails to state a claim on which relief can be granted.

I.      **Whether the Statute of Limitations Bars PNC's IUFTA Claims for the Financial Transfers**

Zilberbrand argues that PNC's financial transfer claims are barred by the four-year statute of limitations set out in the IUFTA. *See* 740 Ill. Comp. Stat. 160/10(a), 10(b). Moreover, Zilberbrand reasons that the "discovery rule," extending the statute of limitations for claims under section 5(a)(1) one year "after the transfer or obligation was or could reasonably have been discovered" does not save PNC's financial transfer claims because PNC moved to amend its complaint over a year after it received a copy of the prenuptial agreement. Nor do the new financial transfer claims relate back to PNC's original complaint, she argues, because they are new and distinct from the claims in the original complaint. PNC reasons that the financial transfer claims cannot be dismissed because fact issues exist as to when the transfers were made, because the doctrine of equitable tolling applies to save the claims from any statute of limitations defense and because, in any case, the claims do relate back to the original complaint.

A.      **Discovery rule for 5(a)(1) claims**

_____

(...continued)
actual fraud under § 5(a)(2) in count I. PNC alleges constructive fraud under § 6(a) in count II. Although PNC alleges both constructive fraud and actual fraud in count I, the court will consider whether PNC has pleaded claims for either type of fraud under the IUFTA. *See Hatmaker*, 619 F.3d at 743 ("[P]laintiffs in federal courts are not required to plead legal theories.").

At the outset, the court notes that all new claims will be judged in light of the IUFTA's four-year statute of limitations, even those brought pursuant to section 5(a)(1) of the IUFTA. Section 10(a) of the IUFTA provides that claims brought under section 5(a)(1) may be brought within four years of the transfer being made or obligation being incurred "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant[.]" 740 Ill. Comp. Stat. 10(a). Count I of PNC's amended complaint alleges that all transfers at issue "were made with actual intent to hinder, delay, or defraud the Debtor's creditors, including PNC, pursuant to the [IUFTA], 740 ILCS 160/5(a)(1)." (Am. Compl. ¶ 56.) Reading the complaint in the light most favorable to PNC, the earliest it could have known about the financial transfers was on June 12, 2012, when Zilberbrand filed a copy of the prenuptial agreement along with her motion to dismiss. (Dkt. 49, Ex. 2.) PNC did not move to amend its complaint to include claims for the financial transfers until June 28, 2013. Because it waited more than one year after it could have discovered the financial transfers, the one-year discovery rule does not apply and the court will apply the four-year statute of limitations to all claims in the amended complaint.

**B.      Four-year statute of limitations**

PNC argues that the financial transfer claims cannot be dismissed because fact issues exist as to when the transfers were made, so the claims are not "conclusively time-barred" on their face. (Dkt. 70 at 4.) The statute of limitations for IUFTA claims require they be made "within 4 years of when the transfer was made or the obligation was incurred." 740 Ill. Comp. Stat. 160/10(a), 10(b). Under Illinois law, a transfer of an asset other than real property is made "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a

judicial lien otherwise than under this Act that is superior to the interest of the transferee." *Id.* at 160/7(a)(2).

"A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses. But when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." *Indep. Trust Corp.* v. *Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). On a motion to dismiss, if the court is unable to determine when the statute of limitations began running on a fraudulent transfer claim, it should not be dismissed. *See, e.g., Cent. States, SE and SW Areas Pension Fund* v. *King Auto Fin., Inc.*, No. 12 C 617, 2012 WL 4364310, at *4 (N.D. Ill. Sept. 19, 2012) ("Plaintiffs' First Amended Complaint does not indicate *when* the fraudulent transfers purportedly took place, nor are they required to do so at this pleading stage. . . . Plaintiffs have not unambiguously revealed that the claim is time-barred in their Amended Complaint. Thus, Defendants' Motion to Dismiss [fraudulent transfer count] is denied.") (emphasis in original); *Waldock* v. *M.J. Select Global, Ltd.*, No. 03 C 5293, 2005 WL 3542527, at *16 (N.D. Ill. Dec. 27, 2005).

Zilberbrand argues that it is "not the transfer which control[s] for statute of limitations purposes, but rather the existence of the claim," which Zilberbrand argues stems from the June 13, 2008 marriage when the prenuptial agreement took effect. (Dkt. 72 at 7-8.) In so arguing, she relies on *Fidelity National Title Insurance Company* v. *Intercounty National Title Insurance Company*, No. 00 C 5658, 2008 WL 4348594 (N.D. Ill. Mar. 26, 2008). The IUFTA count in *Fidelity* was decided in the context of the defendant's summary judgment motion. The plaintiff's expert testified at his deposition that all fraudulent transfers had occurred more than four years before the plaintiff filed its complaint, leading the defendant to argue the plaintiff's

IUFTA claim was barred by the statute of limitations. The plaintiff attempted to create a fact issue by asserting that additional transfers may have been made within the limitations period, warranting denial of the summary judgment motion. But the court determined that possibility was "not enough to deny summary judgment outright." *Id.* at *8. The existence of the additional transfers within the limitations period was "unavailing" because any injury the Plaintiff "may have suffered would have occurred when the first, illegitimate transfer of funds took place." *Id.* Regardless, the court denied the summary judgment motion, relying on the one-year discovery provision in IUFTA.

But the IUFTA itself provides that the statute of limitations begins to run when the obligation is incurred *or* at the time of the transfer. 740 ILCS 160/10. Courts grappling with other states' uniform fraudulent transfer acts have held that where there is a series of transactions, the four-year statute of limitations does not start with the obligation but with the subsequent transfers. For example, in *Grassmeuck* v. *Bensky*, No. C04-2016P, 2005 WL 1076533, at *3 (W.D. Wash. May 5, 2005), the court examined the statute of limitations in Washington's uniform fraudulent transfer act, which also provides that an action must be brought "within four years after the transfer was made or the obligation was incurred." Wash. Rev. Code. § 19.40.091(a) and (b). The defendant there moved for interlocutory appeal or certification to the Washington Supreme Court on the issue of whether the plaintiff's suit was barred by the statute of limitations. It argued that the four-year limitation period had to be calculated from the date that the debtor incurred the obligation to the defendant, which would bar the plaintiff's claims. The plaintiff argued that the date had to be calculated from the latest possible date, which would be three separate transfers of funds that occurred in the months after the obligation was incurred. Under the plaintiff's reading, the suit would not be barred. The

district court accepted the plaintiff's argument and denied the defendant's motions, explaining that the defendant's "argument belies the statute's plain language." *Grassmueck*, 2005 WL 1076533, at **3-4.

Additionally, even where there is evidence that transfers were to take place at a certain time, in the absence of evidence of when the transfers actually occurred courts "decline[ ] to speculate as to the exact date on which such transfers were completed." *Independent Trust Corp*. v. *Fidelity Nat'l Title Ins. Co.*, No. 05 C 5749, 2007 WL 1017858, at *18 (N.D. Ill. Mar. 30, 2007) (refusing to conclude that IUFTA counts were "indisputably time-barred" where the plaintiff did not allege precisely when funds were transferred, despite evidence that third party had instructed that its order that funds be converted to defendant's use "be immediately and fully implemented" outside of limitations period). As discussed in more detail below, neither the JSSI transfer claim nor the paragraph 19 transfer claim is barred by the statute of limitations.

### 1. JSSI transfer

The amended complaint alleges that Debtor sold his interest in JSSI on May 27, 2008 and received approximately $15,420,642 in immediately available funds and in two notes due on May 27, 2013. (Am. Compl. ¶ 39.) The prenuptial agreement provides that Debtor would pay Zilberbrand an amount equal to 40% of the sale proceeds. (Am. Compl., Ex. 8 at ¶ 8(b).) Zilberbrand insists that because the transfer was made pursuant to Debtor's obligation in the prenuptial agreement (which became effective upon his marriage to Zilberbrand on June 13, 2008, *see PNC I*, 2013 WL 1278602, at *3 (citing 750 Ill. Comp. Stat. 10/5)), PNC had to have brought the claim by June 13, 2012. But under the IUFTA, the statute of limitations begins running when "the transfer was made *or* the obligation was incurred[.]" 740 Ill. Comp. Stat. 160/10(a), (b) (emphasis added); *see also Grassmueck*, 2005 WL 1076533, at **3-4. Here, the amended

complaint does not indicate when Debtor made the transfer of the proceeds to Zilberbrand. *See Independent Trust*, 2007 WL 1017858, at *18. The four-year statute of limitations does not bar this claim.

### 2. Paragraph 19 transfers

Paragraph 19 of Zilberbrand and Debtor's prenuptial agreement provided that Debtor would begin paying Zilberbrand $11,200 per month starting on the first day of the first calendar month following their marriage, *i.e.*, July 1, 2008, until they moved into the Mohawk property. (Am. Compl., Ex. 9 at ¶ 19(a).) It also provided that Debtor would pay Zilberbrand for all costs necessary to maintain the Goethe property for as long as she owned it. (*Id* at ¶ 19(b).) As with the JSSI transfer, PNC alleges that because "there are questions" as to when the paragraph 19 transfers took place, this issue cannot be disposed of on a motion to dismiss. (Dkt. 70 at 5.) Zilberbrand makes the same arguments concerning the paragraph 19 transfers as it did concerning the JSSI transfers, and again, these arguments must fail. As PNC points out, though the court has information as to when Debtor incurred the obligation to make the paragraph 19 transfers (June 13, 2008), it does not know when or if those transfers were actually made. Since the statute of limitations begins running when an obligation is incurred or transfer is made, the court is not convinced that the statute of limitations bars relief for all paragraph 19 transfers, as it is unclear at this time when they took place. The fact that the prenuptial agreement provides when the paragraph 19 transfers (and the JSSI transfer) were to take place is insufficient to convince the court to hold otherwise. *See Independent Trust*, 2007 WL 1017858, at *18.

### C. Relation back

Even if the statute of limitations prevented PNC from pursuing the financial transfer claims, the claims would likely relate back to its original complaint. Rule 15(c)(1)(B) provides that an amendment to a pleading relates back to the date of the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). In general, relation back is permitted under Rule 15 where "an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading." *Bularz* v. *Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996). The question for the court is "whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." *Santamarina* v. *Sears, Roebuck Co.*, 466 F.3d 570, 573 (7th Cir. 2006). "[T]he Illinois and federal relation-back rules are the same," so the analysis under either set of rules is identical. *Cue* v. *Learjet Inc.*, 837 F. Supp. 2d 788, 792 (N.D. Ill. 2011) (citing *Springman* v. *AIG Mktg., Inc.*, 523 F.3d 685, 688 (7th Cir. 2008)).

Zilberbrand argues that the financial transfer claims are "new and distinct" from the claims in the original, timely-filed complaint because they arise from the prenuptial agreement, whereas the original complaint never mentioned it. (Dkt. 62 at 3; dkt. 72 at 6.) She relies on *Hamilton* v. *O'Connor Chevrolet, Inc.*, No. 02 C 1897, 2003 WL 22953337, at *3 (N.D. Ill. Dec. 12, 2003), in which this court held that claims did not relate back to the plaintiffs' original complaint where the claims arose out of the same general occurrence (the defendants' sale of a car to the plaintiffs) but were based on new and distinct factual allegations (the plaintiffs' signing of a second retail installment contract not mentioned in the previous complaint).

But in the context of IUFTA claims, and although "amended claims should not be presumed to relate back merely because the additional transactions bear the same label as 'preferential' or 'fraudulent,' . . . [where] additional evidence is presented that the additional transaction did in fact arise out of the conduct previously pleaded, amended claims should be held to relate back." *Brandt* v. *Gerardo* (*In re Gerardo Leasing, Inc.*), 173 B.R. 379, 389 (Bakr. N.D. Ill. 1994). Where an original, timely-filed complaint alleged claims under the IUFTA, defendants "should not be prejudiced in having to defend a similar claim" included in an amended complaint. *Shapo* v. *Engle*, No. 98 C 7909, 2000 WL 198435, at *4 (N.D. Ill. Feb. 11, 2000).

For example, in *Gerardo*, the court held that claims normally barred by the two-year statute of limitations found in section 546 of the Bankruptcy Code, 11 U.S.C. § 546(a), related back to the original, timely-filed complaint over the defendant's objections that the claims "involved transfers made by different debtors, through different accounts, and at different times." *Gerardo*, 173 B.R. at 389. There, three related entities were debtors with the same trustee in bankruptcy. The original complaint sought relief for a series of checks one debtor made out to the defendant, and the trustee moved to amend the complaint to seek relief for a second series of checks that a related debtor made out to the defendant in the months following the first series of checks. The court acknowledged, "Considerable difficult arises when court[s] are confronted with an original complaint which pleads a transaction or series of transactions and amendments which seek only to add transactions similar to those already pleaded." *Id.* But it held that the second series of checks related back because the two "streams of payments may be part of a single pattern of conduct" and because the timing of the payment suggested that the payments

were "part of the common scheme or pattern of fraudulent conduct alleged in the original Complaint." *Id.* at 390.

The same reasoning applies here. Although PNC did not specifically refer to the prenuptial agreement in the original complaint, it was clear from the face of the complaint that it sought relief for fraudulent transfers Debtor made to Zilberbrand. Once it obtained the prenuptial agreement, PNC learned that the financial transfers may have been part of a pattern that extended beyond the transfer of the Mohawk property. The allegations in the original complaint were sufficient to put Zilberbrand on notice of the types of transactions PNC sought to avoid, and Zilberbrand should not be prejudiced by having to defend against more IUFTA claims. *Shapo*, 2000 WL 198435, at *4.

Accordingly, the statute of limitations does not bar these claims.[7]

## II.      Whether Debtor received reasonably equivalent value for the financial transfers

To show constructive fraud under sections 5(a)(2) and (6)(a), PNC must demonstrate that Debtor transferred the property "without receiving a reasonably equivalent value in exchange for the transfer . . ." 740 Ill. Comp. Stat. 160/5(a)(2); (6)(a). The IUFTA provides in relevant part that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." *Id.* at 160/4(a). Factors courts consider in determining reasonably equivalent value include "the fair market value of what was transferred and what was received; whether the transaction took place at arm's length; and the good faith of the transferee." *Cordes*, 605 F. Supp. 2d at 1021 (citing *Barber* v. *Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997)). Ultimately, whether a party received reasonably

---

[7] Having so concluded, the court need not determine whether equitable estoppel applies.

equivalent value is a question of fact.  *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 (7th Cir. 1997).

### A.     JSSI transfer

PNC contends that Debtor did not receive reasonably equivalent value for the JSSI transfer because it was made pursuant to the prenuptial agreement, and the court already determined that Zilberbrand's promise to marry Debtor did not constitute reasonably equivalent value.  (Dkt. 25 at 8.)  Although PNC acknowledges that the divorce decree also required Debtor to transfer a percentage of his profits from the JSSI sale to Zilberbrand, the percentage required by each agreement differs.[8]  PNC thus argues that the prenuptial modified Zilberbrand's interest without Zilberbrand's providing additional consideration.  Zilberbrand argues that although the prenuptial agreement provided for the JSSI transfer, this was merely a restatement of Debtor's obligations pursuant to the divorce decree, and that the JSSI transfer satisfied an antecedent debt contained in the divorce decree, constituting reasonably equivalent value.  In any case, she points out, the sale did occur between 30 and 60 months after the divorce decree, so she received 40% of the proceeds regardless.

Under the Illinois Dissolution of Marriage Act, the filing of a dissolution of marriage petition "creates and vests a contingent interest of each spouse in all property of either spouse constituting 'marital property.'"  *Voiland* v. *Kimmell* (*In re Kimmell*), 480 B.R. 876, 886 (Bankr. N.D. Ill. 2012) (citing 750 Ill. Comp. Stat. 5/503(e)).  "This contingent interest ripens into a full

---

[8] While the divorce decree provided that Zilberbrand would receive a decreasing percentage as time passed (50% of the proceeds if the sale occurred in the first 30 months after the entry of judgment; 40% of the proceeds if the sale occurred between months 30 and 60; and 33 1/3% if the sale occurred after 60 months post-divorce decree), the prenuptial agreement provides for Zilberbrand receiving a flat 40%, no matter the date of the sale.  (Am. Compl., Ex. 11 at ¶ VII.1.C; Ex. 8 at ¶ 8.)

ownership interest for any property distributed to such spouse when the divorce court enters an order of distribution or final judgment." *Id.*

The divorce decree awarded Zilberbrand an interest in Debtor's ownership interest in JSSI. Thus, from the date on which the Circuit Court of Cook County approved and entered the divorce decree—September 12, 2003—Zilberbrand owned a percentage of JSSI. PNC does not allege that Debtor was insolvent at the time of the 2003 divorce, such that the transfer pursuant to the divorce decree was fraudulent. When Debtor sold JSSI on May 27, 2008—prior to the remarriage of Zilberbrand and Debtor, and thus prior to the prenuptial agreement taking effect—he was merely making the obligatory transfer to Zilberbrand of what she already owned. PNC does not allege that the divorce decree was no longer in effect when Debtor sold the JSSI stock and made the JSSI transfer. Because Zilberbrand had a "full ownership interest" of the JSSI stock in September 2003, there was no transfer that was fraudulent in 2008. *Kimmell*, 480 B.R. at 887. This claim is dismissed with prejudice.

### B. Paragraph 19 Transfers

The same analysis does not apply, however, to the paragraph 19 transfers. As it did with the JSSI transfer, PNC argues that Debtor did not receive reasonably equivalent value for the paragraph 19 transfers. It relies on the fact that the transfers stemmed from the prenuptial agreement, and this court already determined that Zilberbrand's marriage to Debtor provided no value to Debtor's creditors. Zilberbrand argues that the paragraph 19 transfers are similar to the JSSI transfer in that they fulfill an obligation Debtor incurred in 2003 in the divorce decree. While paragraph 19 of the prenuptial agreement provided that Debtor would pay Zilberbrand $11,200 per month until either moved into the Mohawk property, and that Debtor would pay all

costs of maintaining the Goethe property so long as Zilberbrand owned it, the divorce decree provided that Debtor would make maintenance payments to Zilberbrand of $14,250 per month. (Am. Compl., Ex. 10 at ¶ II.1.) Zilberbrand argues that because "reasonably equivalent value does not have to be identical value," the paragraph 19 transfers are simply a continuation of the obligation Debtor incurred in 2003. (Dkt. 72 at 5.)

To make this argument, Zilberbrand relies on *Barber*, 129 F.3d at 387, in which the Seventh Circuit explained that a court determining whether a transfer was for "reasonably equivalent value" under the Bankruptcy Code need not require that the debtor "collect 'a dollar-for-dollar equivalent to receive reasonably equivalent value.'" *Id.* (quoting *Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 (5th Cir. 1993)). In *Barber*, the Seventh Circuit affirmed a decision rejecting the argument made by the bankruptcy trustee of a soybean producer that a transfer was fraudulent because the producer received less value for soybean seeds than their actual value. This principle, that an exchange need not be "dollar-for-dollar" to be for "reasonably equivalent value" has also arisen in the divorce context. For example, in *Kimmell*, the court held that the consideration received by a debtor under his marital settlement agreement was reasonably equivalent to what he forfeited under the agreement, even though the actual monetary value of the exchange may not have been a "50/50 division of marital property." *Kimmell*, 480 B.R. at 890-93.

But *Barber* and *Kimmell* are distinguishable from the case at hand because in those cases there was a direct relationship between the value paid and the worth of the item: The party seeking to avoid the transfer faced the uphill battle of arguing that paying less than market price for an asset constituted a fraudulent transfer. Here, Zilberbrand argues that one sum of money is

18

reasonably equivalent to a different sum of money paid for two different reasons and pursuant to two different agreements. Indeed, there is no indication that the $14,250 monthly maintenance payment laid out in the divorce decree was even for the same purpose as the paragraph 19 transfers. There is no mention of the Mohawk or Goethe properties in the prenuptial agreement. There is no evidence that Zilberbrand accepted the paragraph 19 transfers in exchange for extinguishing Debtor's obligations under the divorce decree, as was the issue in *Kimmell*. Moreover, for the reasons already discussed in the court's previous opinion on the transfer of the Mohawk property, Debtor was insolvent at the time of the transfers, and PNC has pleaded a claim for actual fraud by pleading sufficient badges of fraud. *See PNC I*, 2013 WL 1278602, at **3-5. Consequently, PNC may move forward with its claims regarding the paragraph 19 transfers.

### C. Paragraph 42 Transfers

Finally, Zilberbrand argues that PNC cannot move forward with its claims in paragraph 42[9] of its amended complaint regarding all "presently unknown and unknowable additional assets that may have been transferred from Debtor to Defendant that Plaintiff may discover during the course of this action." (Am. Compl. ¶ 42.) Zilberbrand argues that this claim does not meet pleading standards set out in Rule 8 because it provides Zilberbrand with no notice of the claims against which she may have to defend. PNC insists that Zilberbrand's motion is "ill-conceived and unfounded." (Dkt. 70 at 10.) It argues that the language in paragraph 42 does put

---

[9] Zilberbrand refers to these claims as the "Paragraph 41 Claims" but quotes language in paragraph 42 of the amended complaint. The court will thus presume that she was referring to the claims in paragraph 42.

Zilberbrand on notice of potential claims, and notes that it is currently seeking details regarding these transfers through discovery.

Rule 9(b), not Rule 8, applies to the allegations. Zilberbrand does not address the applicability of Rule 9(b)'s heightened pleading standard to PNC's allegations. Because PNC's IUFTA allegations sound in fraud, the heightened pleading standard of Rule 9(b) is applicable. *See B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 477-78 (7th Cir. 2005); *Lancelot Investors Fund, L.P.* v. *Ritchie Capital Mgmt.* (*In re Lancelot Investors Fund, L.P.*), No. 08 B 28225, 2012 WL 718631, at *4 n.1 (Bankr. N.D. Ill. Mar. 2, 2012) ("Defendant brings this motion pursuant to Rule 8 pleading requirements. The Court notes, however, that when a claim is based on fraud the heightened pleading standards of Rule 9(b) apply.").

The Seventh Circuit laid out the pleading requirements for a constructive fraud claim under the IUFTA in *General Electric*, 128 F.3d at 1079-80.[10] There, the court cited with approval Form 13, formerly included in the Appendix of Forms to the Federal Rules of Civil Procedure. Form 13 provided an example of a complaint on a joint claim to recover debt and to void a fraudulent conveyance. *Id.* at 1079. The Seventh Circuit explained that the form

> simply requires 1) an allegation of jurisdiction, 2) a statement of the date and the conditions under which the defendant executed a promissory note to the plaintiff, 3) a statement that the defendant owes the plaintiff the amount, 4) a description of the events surrounding the defendant's conveyance of all of his property to the transfer recipient for the purpose of defrauding and for delaying the collection of payment by the plaintiff, and 5) the plaintiff's demand of the court.

---

[10] Because there is case law from the Seventh Circuit and from this district on the application of Rule 9(b) to IUFTA claims, the court is not particularly persuaded by PNC"s reliance on *United States ex rel. Salmeron* v. *Enterprise Recovery Systems, Inc.*, 464 F. Supp. 2d 766 (N.D. Ill. 2006), a False Claims Act case in which the court determined that Rule 9(b)'s mandate of pleading "with particularity" "does not fit well in dealing with extended fraudulent schemes involving a large volume of transactions." *Id.* at 768.

*Id.* at 1079-80. Since the Seventh Circuit decided *General Electric*, other courts have noted that although that decision applied just to a constructive fraud claim under the IUFTA, its findings are relevant to allegations of both constructive and actual fraud. *See Full Perspective Video Serv., Inc.* v. *Garcia*, No. 04 C 3038, 2005 WL 1667807, at *5 (N.D. Ill. July 18, 2005).

PNC has not met the *General Electric* standard here because it has given no description of the events surrounding the paragraph 42 transfers. While some courts have noted that in the context of the IUFTA, "Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could not have been obtained without discovery," *Armada (Singapore) PTE Ltd.* v. *AMCOL Int'l Corp.*, No. 13 C 3455, 2013 WL 5781845, at *3 (N.D. Ill. Oct. 25, 2013) (quoting *Emery* v. *Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1996)), PNC must at least allege the transfer giving rise to its claim. *See, e.g., Seidel* v. *Byron*, No. 05 C 6698, 2008 WL 4411541, at **5-6 (N.D. Ill. Sept. 26, 2008) (dismissing IUFTA claims where plaintiffs insufficiently "state[d] the who, what and where of the alleged fraud with particularity" and failed to allege, *inter alia*, "the value, if any, that defendants received in consideration for the transfer"). "The purpose of requiring that fraud be pleaded with particularity . . . is to force the plaintiff to do more than the usual investigation before filing his complaint," *Ackerman* v. *NW Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999), which PNC did not do prior to including paragraph 42. Moreover, PNC has been engaged in discovery for quite some time now but has not moved to amend its complaint to include any new allegations.

Thus, the motion to dismiss paragraph 42 is granted because its allegations are insufficient under Rule 9(b). The paragraph 42 claims are dismissed without prejudice. Should

PNC discover other transfers that are not barred by the statute of limitations as it continues discovery, it may move to amend its complaint to include those transfers.

### ORDER

For the above stated reasons, Zilberbrand's motion to dismiss PNC's first amended complaint (dkt. 61) is granted in part and denied in part. It is granted with prejudice as to the claims in the amended complaint related to the JSSI transfer. It is granted without prejudice as to the paragraph 42 claims. It is denied with regards to the paragraph 19 transfers. The parties shall proceed with discovery as ordered by the court on January 16, 2014 (*see* dkt. 90), and shall report for a status conference on March 4, 2014.


Date:   February 4, 2014

U.S. District Judge Joan H. Lefkow